IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MATEO BJORN JAMES and<br>LASHAWN MARQUIZE FREEMAN,<br><br>Defendants. | ) | No. 3:24-CR-87-KAC-DCP |

**REPORT AND RECOMMENDATION**

All pretrial motions are referred to the undersigned for disposition or recommendation as appropriate. *See* 28 U.S.C. § 636(b). This case is before the undersigned on Defendant Lashawn Freeman's [Doc. 31] and Defendant Mateo James's [Doc. 32] Motions to Suppress. Defendants are charged with drug trafficking and firearms offenses [Doc. 62] based in part upon the execution of a search warrant at 2825 Cecil Avenue in Knoxville, Tennessee. Defendants ask the Court to suppress all evidence stemming from a protective sweep of the residence and from the execution of a search warrant at the residence, arguing that both searches violated the Fourth Amendment [Doc. 31 pp. 1, 4 – 9; Doc. 32 pp. 1, 5–6].

On November 15, 2023, officers surveilling 2825 Cecil Avenue (the residence") observed Defendant James arrive and enter the residence. Deputy United States Marshal Greg Dahl ("DUSM Dahl"), Task Force Officer Chris Stewart ("TFO Stewart"), and a team of officers approached the residence to arrest Defendant James on outstanding warrants. From the yard, DUSM Dahl observed Defendant James through the glass front door. Officers smelled marijuana emanating from the residence during their approach. Defendant James came out onto the front

porch where he was arrested. While on the porch assisting with the arrest, DUSM Dahl saw a handgun with an extended magazine and a rifle through the glass front door. Defendant James said another person is inside. The officers conducted a protective sweep of the residence but did not locate anyone else inside. Officers searched Defendant James incident to his arrest and located one-half gram of heroin in his pocket. Defendant James told law enforcement that he was not the primary resident, that he and others used marijuana in the residence, and that the residence contained firearms for protection. Law enforcement obtained a search warrant for the residence and executed it that same day, seizing suspected controlled substances including marijuana, seven firearms and ammunition, currency, four cell phones, and scales.

Defendants raise a Fourth Amendment challenge to both the warrantless protective sweep and the subsequent search of the residence pursuant to a search warrant. They contend that law enforcement lacked a reasonable, articulable basis to perform a sweep of the residence for officer safety. They also contend that the affidavit in support of the search warrant fails to provide probable cause to issue the warrant. Specifically, they contend probable cause is based almost exclusively upon information illegally obtained during the sweep and that the affidavit fails to establish a nexus between the residence and drug trafficking. They also request a hearing on the validity of the affidavit alleging it contains false statements material to probable cause. Finally, Defendants deny the officers executed the search warrant in good faith.

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds no Fourth Amendment violation. As an initial matter, the undersigned concludes that Defendant James lacks standing to challenge either search of the residence. The undersigned also finds that officers properly conducted a protective sweep because they reasonably believed another individual was inside the residence where they had observed firearms. The undersigned

further finds that the affidavit is not based upon illegally gained information and provides a substantial basis for finding probable cause, including a nexus between the residence and evidence of drug trafficking. The undersigned finds that a *Franks* hearing is not warranted because Defendants fail to make a substantial preliminary showing that the affiant intentionally or recklessly included false information necessary to probable cause. Finally, even if the probable cause in the affidavit was deficient, the undersigned finds the officers searched the residence in good faith reliance on the search warrant. Accordingly, the undersigned recommends that the District Judge **DENY** Defendants' motions to suppress [Docs. 31 & 32].

## I. BACKGROUND AND EVIDENCE

The Grand Jury returned a Superseding Indictment[1] charging Defendants James and Freeman, five named codefendants, and unnamed others with conspiring to distribute and possess with intent to distribute 400 grams or more of a mixture containing fentanyl and 50 grams or more of methamphetamine between July 2021 and June 24, 2025 (Count One) [Doc. 62 pp. 1–2]. Defendants James and Freeman are also charged with possession of methamphetamine (Count Three) and heroin (Count Four) with intent to distribute and with possession of a firearm, including a machine gun, in furtherance of drug trafficking (Count Five), all allegedly occurring on November 15, 2023 [*Id*. at 2–3]. Defendant James is separately charged with possession of a firearm in furtherance of drug trafficking on multiple days between July 2021 through May 21,

---

[1] The original Indictment charged only Defendants Freeman and James with possession of 400 grams or more of a mixture containing fentanyl (Count One) and 50 grams or more of methamphetamine (Count Two) on November 15, 2023, with intent to distribute [Doc. 3 pp. 1–2]. It also charged Defendants with possession of firearms, including machine guns, in furtherance of drug trafficking on November 15, 2023 (Count Three) [*Id*. at 2]. The original Indictment separately charged Defendant James with being a felon in possession of a firearm and ammunition on November 15, 2023 (Count Four) [*Id*.].

2025 (Count Two), and with being a convicted felon in possession of a firearm on November 15, 2023 (Count Six) [*Id*. at 2, 4].

On June 23, 2025, Defendant Freeman filed a Motion to Suppress, asking the Court to suppress all evidence seized during the execution of a search warrant at the residence at 2825 Cecil Avenue [Doc. 31 p. 1]. Defendant Freeman argues the search of the residence violates the Fourth Amendment because the affidavit supporting the search warrant was based in part upon an illegal entry into the property following Defendant James's arrest on the front porch [*Id*. at 1, 4–5]. He contends the officers had no lawful right of access to the firearms allegedly observed through the front door during Defendant James's arrest, nor did they have any articulable facts that someone inside the residence posed a danger to them [*Id*. at 5]. Defendant Freeman also asserts that the supporting affidavit fails to provide a nexus between the residence and drug trafficking and contains false statements of material fact warranting a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 171 (1978) [*Id*. at 6–7, 9]. Defendant Freeman maintains that the arrest of Defendant James outside the residence did not provide a basis to search inside the residence, nor did James have authority to consent to a search of the residence [*id*. at 8]. Finally, Defendant Freeman denies that the odor of marijuana provides probable cause to search the residence because the officers were there to arrest Defendant James and he told them that he "had no connection to the house" [*Id*. at 9].

Also on June 23, 2025, Defendant James moved on Fourth Amendment grounds to suppress evidence found because of unlawful searches of the residence [Doc. 32 p. 1]. He argues that the officers had no lawful basis to enter the residence after arresting him outside [*Id*. at 5]. He contends that the search warrant was issued "almost entirely based on information gleaned from the unlawful entry and search of the residence" following his arrest [*Id*.]. He also asserts that the

search warrant affidavit failed to provide a nexus to the residence because after his arrest, he told the officers that he did not live at the residence and that he had no connection to it [*Id.*]. Defendant James contends the affidavit falsely states that he lived at the residence because his identification lists a different address, the arrest warrant listed a different address for him, and witnesses on the scene told law enforcement that the residence was not James's house [*Id.* at 5–6]. Thus, he argues that he is entitled to a *Franks* hearing [*Id.* at 6].

The Government responded in opposition to Defendants' suppression motions, asserting both the protective sweep and the search pursuant to a search warrant were lawful [Doc. 34 p. 1]. It contends that Defendant James's motion should be dismissed because he disavows any connection to the residence and therefore lacks standing to challenge the searches [*Id.* at 3–4]. The Government argues that officers lawfully conducted a protective sweep of the residence for officer safety because Defendant James told them another person was inside and they observed firearms through the glass front door [*Id.* at 5]. It also maintains the officers could enter the residence to secure its contents while they sought a search warrant [*Id.*]. The Government contends that information within the four corners of the search warrant affidavit provides probable cause for a search warrant, including that trained officers identified the odor of marijuana coming from the residence [*Id.* at 7]. It asserts that the affidavit also demonstrates a nexus between the residence and drug trafficking based upon the odor of marijuana and the firearms visible through the front door [*Id.* at 8]. It denies that Defendants have made the requisite substantial preliminary showing necessary for a *Franks* hearing [*Id.* at 8–10]. Finally, the Government asserts that even if the Court finds the affidavit lacks probable cause, the evidence should not be suppressed because the officers executed the search warrant in good faith [*Id.* at 10–11].

The parties appeared before the undersigned for an evidentiary and suppression hearing on November 21, 2025 [Doc. 164, Transcript]. Assistant United States Attorney Miriam Johnson appeared on behalf of the Government [*Id*. at 4]. Attorney Mark E. Brown represented Defendant Freeman [*Id*]. Attorney Joshua D. Hedrick represented Defendant James [*Id*.]. Both Defendants were also present [*Id*.]. The parties first presented argument on the sufficiency of the search warrant [*Id*. at 5–39]. The Government introduced the search warrant affidavit as an exhibit to the hearing [*Id*. at 18; Exh. 1]. In support of the Defendants' request for a *Franks* hearing, Mr. Hedrick introduced a letter showing the extent of law enforcement surveillance in the vicinity of the residence [Doc. 164 p. 29–30; Exh. 2] along with screen shots from a map of the area [Doc. 164 p. 35; Exh. 4]. Mr. Brown introduced a portion of the audio recording of the interview of Defendant James [Doc. 164 p. 34; Exh. 3]. The Government presented additional parts of the audio recording [Doc. 164 pp. 35–36] and the testimony of DUSM Greg Dahl [*id*. at 39–90]. The evidence presented at the hearing is summarized below.

**A. Affidavit for Search of 2825 Cecil Avenue**

On November 15, 2023, Knox County Sheriff's Office ("KCSO") Detective Matthew Johnson presented a seven-page affidavit with an attached photograph and map in support of a search warrant for Mateo James and a residence at 2825 Cecil Avenue, in Knoxville, Tennessee [Exh. 1].[2] In the affidavit, Detective Johnson asks to search the residence for evidence of the sale of controlled substances and conspiracy to sell controlled substances [*Id*. at 1]. He states that James, who was arrested at the residence, has a 2019 felony conviction for Schedule VI drugs from Knox County [*Id*. at 1–2]. According to Detective Johnson, based on information from Detective

[2] This affidavit also appears in the record as an attachment to the Government's response [Doc. 34-1 pp. 1–9].

Pickett as told to Detective Pickett from Officer Stewart, on November 15, 2023, Officer Stewart from the Smoky Mountain Fugitive Task Force conducted surveillance on Mateo James, who had outstanding arrest warrants for violations of probation for sale and delivery of marijuana, unlawful carrying of weapons, and assault [*Id*. at 3]. Detective Johnson said James arrived at the residence in a black Jeep, exited his vehicle, and entered the residence [*Id*.]. He stated that TFO Stewart took James into custody on the outstanding warrants when James exited the front door of the residence a short time after his arrival [*Id*.]. Detective Johnson states that TFO Stewart surveilled the residence over the two-week period preceding the arrest and saw the same black Jeep that James was driving at the residence on multiple occasions [*Id*.].

The affidavit relates that while arresting James at the front door, TFO Stewart smelled "a strong odor of marijuana from within the residence" and found one-half gram of heroine in James's pocket [*Id*.]. Detective Johnson states that DUSM Greg Dahl told him that he observed James inside the residence through the glass front door before he was arrested [*Id*. at 4]. DUSM Dahl said while arresting James, he smelled a strong odor of marijuana coming from the residence and he saw a Glock handgun with an extended magazine and a backpack containing what DUSM Dahl thought was a rifle [*Id*.]. According to Detective Johnson, James told DUSM Dahl that another man was inside the residence [*Id*.]. After arresting James, DUSM Dahl performed a "safety sweep" of the residence but did not find anyone else inside [*Id*.].

Detective Johnson stated that based upon his training, experience, and participation in investigations of drug trafficking conspiracies, he knows that drug dealers conceal contraband, drug proceeds, and records related to drug trafficking "in secure locations, such as their own residences, and locations which they control but are titled in the names of others" as well as in the residences of coconspirators [*Id*. at 5 (¶ 10)]. He also states that drug dealers commonly possess

firearms on their person and in their residence to protect their controlled substances and proceeds [*Id.* at 6 (¶ 16)]. He says that drug dealers use temporary residences, which they change frequently, to avoid being identified or arrested by law enforcement [*Id.* (¶ 19)].

Based upon the above information, Detective Johnson concludes that Mateo James currently lives at the residence and possesses heroin and marijuana there [*Id.* at 7]. He also concludes that James sells heroin and marijuana from the residence and stores proceeds of drug sales there [*Id.*]. Accordingly, Detective Johnson believes that evidence of "the possession and sale of illegal drugs, specifically heroin, fentanyl, and methamphetamine" and materials used in packaging drugs for resale are located at the residence [*Id.*].

Knox County Criminal Court Judge Scott Green issued a search warrant for Mateo James and the residence at 2:01 p.m. on November 15, 2023 [Doc. 34-1 p. 10–14]. Officers executed the search warrant at 2:21 p.m. on that same day and seized three handguns from the living room (one from a backpack) [Doc. 32-2 p. 1]. Also from the living room, officers also seized 58.6 grams of methamphetamine, MDMA pills, unidentified pills, unidentified powder, marijuana, scales, ammunition, and four cell phones [*Id.* at 3]. From another room, officers seized unidentified pills, 71.6 grams of an unidentified white-grey powder, $1,723, a fifth handgun, an AK47 firearm, assorted magazines, and ammunition [*Id.* at 2]. From a third room, officers seized more than 80 grams of methamphetamine and "mixing materials" [*Id.* at 4]. A seventh firearm was seized from a closet [*Id.* at 5].

**B. Letter, Maps, & Audio of James Interview**

Defendants presented three exhibits to demonstrate the affidavit contains false statements. Mr. Hedrick presented a letter from the Government dated October 24, 2025, regarding Defendant James's request for surveillance logs [Exh. 2]. In the letter, Government's counsel states that no

surveillance logs exist and that surveillance of the residence involved officers driving by the residence and "spot-checking" for the vehicle [*Id*. at 1]. The letter states that TFO Stewart conducted surveillance around Cecil Avenue, Cherry Street, and Magnolia Avenue; observed James's Jeep at the residence on "multiple occasions;" and saw Defendant James driving the Jeep [*Id*.]. Mr. Hedrick presented two screen shots of a map showing the area encompassed by the three streets referenced in the letter in relation to the residence [Exh. 4].

Mr. Brown presented a twenty-five-second audio clip of law enforcement's interview of Defendant James [Exh. 3]. In this clip, Defendant James tells the officer that illegal things are "going on behind an arrest warrant, not a search warrant, an arrest warrant" [*Id*. at 4:45–47]. When the officer asks if illegal stuff is going on in the house, Defendant James says that he does not know what is going on in the house [*Id*. at 4:52–56].

AUSA Johnson played an overlapping six-minute clip from the same audio recording of Defendant James's interview [*Id*. at 1:10–7:12].[3] On the recording, Detective Matthew Johnson asks Defendant James if he is willing to answer some questions about the residence, Defendant James says he wants to know what is going on because the residence is not his house [*Id*. at 0:57–1:07]. Detective Johnson says that U.S. Marshals and federal agents were looking for Defendant James at the residence to arrest him on some warrants, and Defendant says they told him that they were arresting him for probation violations from 2020 [*Id*. at 1:08–33]. Defendant says that it is "the extra" that he does not understand and asks why the officers "are pressuring [him] about this house" [*Id*. at 1:33–40].

[3] Although not played at the hearing, the beginning of the audio recording reflects that Detective Matthew Johnson advised Defendant James of the *Miranda* rights [Exh. 3 0:40–0:54].

On the audio recording, Detective Johnson states that he came to the scene because officers who were in the house looking for Defendant James found drugs in plain view in the residence [*Id*. at 1:40–51]. Defendant James denies that has anything to do with him and repeats that it is not his house [*Id*. at 1:51–2:00]. Defendant says he just arrived from getting fast food and that his food and bottle of water are on the floor inside the residence [*Id*. at 2:01–09]. Defendant says that his cousin was supposed to be outside in the driveway, but Defendant assumes that when the police came, his cousin ran into the woods and is somewhere in the area [*Id*. at 2:09–20]. Defendant James states that his cousin was there with him, and he does not know where his cousin went [*Id*. at 2:20–32]. Defendant agrees with Detective Johnson that as you walk up to the front of the house, it smells "like weed" [*Id*. at 2:37–43]. He says the residents smoke weed "in there," and he smokes weed, but anything "extra" has nothing to do with him [*Id*. at 2:43–53]. Defendant says this is his cousins' house, and he comes over to hang out with them and play videogames [*Id*. at 2:53–3:00].

Detective Johnson asks Defendant James if he knows anything about the firearm that is visible from the porch [*Id*. at 3:00–10]. Defendant states that there are weapons in the house, that the house has been broken into, and "they" purchased guns for protection [*Id*. at 3:14–23]. Detective Johnson asks if Defendant means his cousin when he says "they," and Defendant says his "little cousins" live here [*Id*. at 3:23–32]. Detective Johnson asks for their names, but Defendant says he does not want to implicate them in crimes when they are not here to defend themselves [*Id*. at 3:32–48]. Detective Johnson tells Defendant James that currently, he is the only one in the house, and the items discovered in the house will be attributed to him [*Id*. at 3:49–57]. Defendant says that his name is not on the lease [*Id*. at 3:57–4:02]. Detective Johnson says the name on the lease has nothing to do with who is in the house and who possesses the items in the house [*Id*. at 4: 02–15]. Defendant states that he came outside, and he had a little bag of heroin in his possession

that he snorts to keep from being sick [*Id*. at 4:21–28]. Defendant states that the officers took the bag of heroin from him and started treating him badly because they smelled weed and the dogs were barking at the door, and then they let the people's dogs out of the house [*Id*. at 4:28–41]. Defendant says that a lot of illegal stuff is going on "behind an arrest warrant, not a search warrant, an arrest warrant" [*Id*. at 4:41–48].

Defendant tells Detective Johnson that he came outside willingly to be arrested [*Id*. at 4:48–53]. Detective Johnson asks if there are illegal activities going on in the house, and Defendant responds that he does not know what is going on in the house [*Id*. at 4:53–58]. Defendant agrees that the residents smoke marijuana when he is around but says does not know about anything beyond that [*Id*. at 4:58–5:03]. Defendant says this is his cousin Shawn's house [*Id*. at 5:03–08]. Detective Johnson asks for Shawn's last name, and Defendant asks if this is a statement that can be used against them [*Id*. at 5:08–27]. Detective Johnson tells Defendant that right now, anything found in the house will be attached to him, but if that is not correct, now is Defendant's opportunity to give him more information [*Id*. at 5:30–42]. Defendant asks how providing information will work because he does not want to implicate others who are not here to speak for themselves, but he is not taking responsibility for everything that is in their house [*Id*. at 5:50–6:10]. Detective Johnson said Defendant's cousins are going to let him "take this hit" [*Id*. at 6:20–27]. Defendant says the residence belongs to his cousin Shawn Freeman [*Id*. at 6: 30–34]. Defendant says he does not know why his cousin ran [*Id*. at 35–42]. Detective Johnson asks if the guns belong to Shawn, but Defendant denies knowing to whom the guns belong and repeats that the residents got guns because the house had been broken into [*Id*. at 6:42–7:04]. Defendant denies knowing how many guns are inside or the type of guns [*Id*. at 7:05–10].

### C. Testimony of DUSM Greg Dahl

DUSM Greg Dahl testified that he has worked with the United States Marshal Service ("USMS") for sixteen years [Doc. 164 p. 40]. He said as a part of his duties, he serves on the Smoky Mountain Fugitive Task Force, where he serves as a team leader and assists task force officers in serving warrants [*Id.*]. He said in addition to serving federal warrants, the Smoky Mountain Fugitive Task Force serves state warrants for violent offenders [*Id.*]. DUSM Dahl stated that he also serves as a tactical trainer for the USMS [*Id.* at 41]. He estimated that he has executed thousands of arrest warrants while with the USMS [*Id.*]. DUSM Dahl said he has smelled the odor of marijuana both in training and frequently while in the community making arrests [*Id.*].

DUSM Dahl recalled assisting the KCSO in executing an arrest warrant for Mateo James on November 15, 2023 [*Id.* at 41–42]. He said Defendant James had four warrants from Knox County for "dangerous drugs" and several warrants from Blount County [*Id.* at 42]. DUSM Dahl also knew Defendant James was a convicted felon [*Id.*]. He said on the morning of November 15 the entire Task Force, which was made up of deputy marshals and task force officers from different agencies, prepared to arrest Defendant James [*Id.*]. He said they performed surveillance of 2825 Cecil Drive and of a vehicle [*Id.*]. He said they had information that Defendant James had been staying at the residence and driving a black Jeep [*Id.* at 42–43]. DUSM Dahl said surveilling officers saw a male, whom they believed was Defendant James, leave the residence and return later in the same vehicle [*Id.* at 43]. He said they saw Defendant James get out of the vehicle and walk into the residence [*Id.*].

DUSM Dahl identified a photograph of the residence [*Id.*; Exh. 5A]. He said the team decided to surround the house and make contact [Doc. 164 p. 43]. He said while some officers pulled into the driveway of the residence, he and DUSM Eric Cheatham pulled into the neighbor's

driveway which is next to the residence [*Id*. at 44]. DUSM Dahl said he was the "shield operator" for the team that day, which meant that he carried a "level 3-A ballistic shield" in the front in case the team was fired upon as they approached the residence [*Id*.].

DUSM Dahl said he saw Defendant James go inside the residence [*Id*.]. He said the door on the residence was a glass storm door, with an inner door that was open [*Id*.]. He said as he crossed the front yard with the shield, he saw Defendant James who was standing at the door looking out at DUSM Dahl [*Id*. at 44–45]. He stated that he saw Defendant James look over his shoulder which made him think that either Defendant James was going to run or he was telling someone the police were here [*Id*. at 45]. DUSM Dahl said Defendant James again faced forward' and the team had their weapons pointed toward Defendant James as the shield reached the foot of the stairs to the front porch [*Id*.]. He said Defendant stepped out onto the porch,[4] and they commanded Defendant to show his hands, which he did [*Id*.]. DUSM Dahl said he typically has the arrestee grab his own collar so that he can check the person's waistband for weapons, and once the team determines the person's hands are empty, they move the person to a location from which another officer without the shield can handcuff and search him [*Id*.].

DUSM Dahl said as the officers approached the porch, several officers remarked on the strong odor of marijuana [*Id*. at 46]. He said Defendant was brought down from the porch where he was handcuffed and frisked for weapons [*Id*.]. He stated that Defendant did not have any weapons on his person, but the officers found "dope" in his pocket [*Id*. at 53].

DUSM Dahl said while members of the team were on the porch arresting Defendant James, two large pit bull dogs were inside and hitting the door, which was not securely latched [*Id*. at 46]. He said while other officers were handcuffing Defendant, he put his foot against the door so the

---

4 DUSM Dahl referred to the porch as a "landing" in parts of his testimony [Doc. 164 p. 45].

dogs could not get out and possibly bite an officer [*Id.*]. He said one of the team members asked Defendant if anyone else was inside, and Defendant responded that his cousin was inside the residence [*Id.*]. DUSM Dahl said while his foot was against the door, he also held the shield against the door [*Id.* at 47]. He said the shield has a large clear triangle in it, and he could see through this triangle into the living room [*Id.*]. He said he saw a pistol lying on a chair three or four feet from the door [*Id.*] He stated that a backpack was sitting next to the chair, and a rifle barrel extended from the backpack [*Id.*]. DUSM Dahl identified a photograph of the chair and backpack beside it as seen through the front door [*Id.* at 49; Exh. 6]. He also identified a second photograph of the chair with the gun on it and the barrel of the rifle extending from the backpack [Doc. 164 p. 50; Exh. 7].

DUSM Dahl stated that the gun visible on the chair close to where Defendant James was standing when they first saw him through the door created a safety issue for the officers because Defendant James said another person was inside the house [Doc. 164 p. 51]. He also stated that the gun was evidence of a new crime because Defendant James was a convicted felon so he knew that law enforcement would be at the residence longer [*Id.* at 51–52]. DUSM Dahl said a safety sweep was necessary to get the person remaining inside the house away from the weapons [*Id.* at 52]. He said he and other officers swept the residence to look for other people inside [*Id.*]. He stated that during the sweep, the officers saw additional firearms, a large bag containing pills on a desk, and scales [*Id.*]. He stated that once the officers determined that no one else was inside the residence, they exited and secured the residence to make sure no one entered while an agent from the Bureau of Alcohol Tobacco and Firearms ("ATF") and a member of the Knox County Narcotics Unit were called [*Id.* at 52–53].

On cross-examination by Mr. Brown, DUSM Dahl stated that he was not aware of who owned or rented the residence when he arrived there to arrest Defendant James [*Id*. at 54, 57]. He stated that he was not the one who took Defendant James into custody because he had the shield and a weapon in his hands [*Id*. at 54]. He said, instead, he saw that Defendant did not have a weapon and then "passed [him] off" to another officer [*Id*.]. DUSM Dahl was not sure whether Defendant was still on the porch when he was handcuffed [*Id*. at 54–55]. He said he did not interview Defendant [*Id*. at 55].

DUSM Dahl said before he entered the residence, he radioed an officer "on the perimeter" to open the back door so that the dogs had a way out and would not be cornered [*Id*. at 55–56]. He said Defendant James was standing inside a few inches away from the glass door, as the officers approached the residence [*Id*. at 56]. He agreed Defendant James came out of the residence without incident [*Id*.]. DUSM Dahl said during the sweep, he saw some rifles in a closet [*Id*. at 57].

In further cross-examination by Mr. Hedrick, DUSM Dahl testified that generally when the Fugitive Task Force executes a state arrest warrant, the state agency has requested its assistance through one of the task force officers [*Id*. at 58–59]. He said the Fugitive Task Force will take cases involving drug distribution for heroin, methamphetamine, or fentanyl; cases in which the wanted individual has a violent criminal history or prior weapons convictions; or cases like this one in which the state agency has had a difficult time locating the wanted person [*Id*. at 60]. He agreed that cases involving someone wanted for an offense involving only marijuana would probably not be taken by the Fugitive Task Force [*Id*. at 61]. DUSM Dahl did not recall which drugs underlay Defendant's warrants for "dangerous drugs" but he thought Defendant's Blount County charges were for violent offenses [*Id*.]. He said TFO Chris Stewart with the KCSO was

the task force officer who brought this case and who told him that Defendant had multiple charges for drug distribution [*Id*. at 62].

DUSM Dahl said he was not wearing a body camera at the time of this arrest [*Id*. at 62–63]. He said the USMS did not require them to wear one at that time, and the policy was that task force officers did not wear them if the deputy marshals were not wearing them [*Id*. at 63–64]. He stated that on the day of the arrest, he had the residence under surveillance looking for Defendant James because he had information that Defendant James was staying there and was driving a black Jeep that was in the driveway of the residence [*Id*. at 65]. He said while surveilling the residence they saw Defendant James leave the residence in the Jeep and then return in it [*Id*. at 65–66].

DUSM Dahl stated that prior to traveling to the residence, the team had a planning meeting, but he did not recall if they knew who owned the residence [*Id*. at 66–67]. He said the case agent, who in this case was TFO Stewart, would have had more information on the residence while he (DUSM Dahl) considered the tactical aspects of the arrest [*Id*. at 67–68]. He said prior to arrival in the area of the arrest, they did not know if there were guns in the house, and he did not recall discussing the criminal history of the "house resident" [*Id*. at 68].

DUSM Dahl testified that he was surveilling the residence from down the street when he saw the Jeep return to the residence [*Id*. at 71]. He could not remember if the Jeep pulled into the driveway or parked on the street [*Id*.]. DUSM Dahl agreed that if photographs from that day showed the Jeep had pulled to the back of the house, that is where Defendant James parked it [*Id*. at 73]. He thought Defendant James entered the residence through the front door [*Id*.]. DUSM Dahl said he was not using binoculars and could not tell if Defendant James was carrying anything as he entered the residence, but another officer with him had binoculars [*Id*.]. He thought seven or eight officers were on the team executing the arrest warrants for Defendant James [*Id*. at 74]. He

said multiple officers watched the back of the residence while he and the others approached the front door with the shield [*Id.*]. He thought the officers surveilling the back of the residence ran to get in place before he was at the front door [*Id.* at 74–75]. DUSM Dahl stated that if someone flees out the back of the house, the officers in the back will issue commands to stop the person and, if it is the wanted individual, will pursue the person [*Id.* at 75]. He agreed that if they are pursuing a fleeing subject, the officers in the back will radio the officers in the front [*Id.*]. He agreed that no one ran from the back of the house in this case [*Id.* at 76].

DUSM Dahl stated that he was crossing the yard near the front door when he first saw Defendant James standing in the doorway of the residence [*Id.* at 77; Exh. 5B]. He agreed that the glass storm door was closed but the front door was opened [Doc. 164 p. 77]. DUSM Dahl said the door to the residence was elevated and the porch was a little lower than his shoulder when he was standing in the yard [*Id.*]. He said other members of the team identified Defendant James as the wanted individual when they saw him walking to and from the Jeep [*Id.*]. He said when he saw Defendant James in the doorway, he knew Defendant James was the same person who was in the vehicle from his clothing and from photographs of Defendant James [*Id.* at 78]. DUSM Dahl said he commanded Defendant to show his hands before asking him to step out of the residence to make sure he did not have a weapon in his hands [*Id.*]. He said Defendant James showed his hands [*Id.*]. He said at this time Defendant was still standing at the door and he was still on the lawn moving toward the steps to the porch [*Id.* at 79].

DUSM Dahl said he next commanded Defendant to open the door and step outside, and Defendant complied [*Id.*]. He stated that when Defendant James came outside, the door swung closed but did not latch [*Id.*]. He said he was climbing the steps to the porch as Defendant stepped outside [*Id.* at 80]. DUSM Dahl said he then asked one of the officers behind him to "go hands

on," which meant to handcuff Defendant [*Id.*]. He said they had Defendant move "down a little bit" so that he could place his shield between Defendant and the door [*Id.*]. DUSM Dahl thought he and Defendant passed each other on the steps as he was going to put his shield against the door and the other officer was taking Defendant into custody [*Id.* at 80–81]. He said he stepped onto the porch and saw that two dogs were trying to get out behind Defendant [*Id.* at 82]. He agreed Defendant was not handcuffed on the porch [*Id.*]. DUSM Dahl said he kicked the door to get the attention of anyone in the residence, announced the presence of police officers, and yelled for anyone inside to come to the sound of his voice [*Id.* at 83]. He said he heard no response and the dogs were barking [*Id.*]. He said at that point, he had not heard anything from the officers in the back of the house [*Id.*]. He did not know where Defendant was taken after he was handcuffed and frisked [*Id.* at 85].

DUSM Dahl said prior to going to the residence to arrest someone, the case agent would research the individual to be arrested and get a copy of the arrest warrant [*Id.* at 84]. He said generally, when the case is adopted by the USMS, they need the case agent to provide photographs, criminal history, and the current warrants of the person to be arrested [*Id.* at 84].

DUSM Dahl testified that he requested that an officer at the back of the house open a door to let the dogs out [*Id.* at 85]. He said after the officers in the back confirmed that the dogs were out, he then had another officer come around him and open the door to the residence [*Id.* at 85–86]. He affirmed that the officers in the back did not say that anyone came out with the dogs [*Id.* at 86]. He said the entire time the officers were inside the residence, they were continuously announcing "police" and "come to the sound of my voice" [*Id.* at 86–87]. He said the officers entered the house in a prearranged order staying behind the shield [*Id.* at 87]. He agreed that at this point, Defendant was likely moved from the front of the house [*Id.* at 87–88].

DUSM Dahl identified a video of the residence as it appeared on the day of Defendant James's arrest [*Id*. at 89; Exh. 10]. The video begins with the person filming stating the date is November 15 and the time is 14:24 (2:24 p.m.) [Exh. 10 0:02–08]. The person filming states that the video is being made before the execution of a search warrant at 2825 Cecil Avenue [*Id*. 0:10–13]. The video starts on the porch outside the storm door to the residence [*Id*.]. The video shows the interior of the residence and concludes with filming three vehicles including a black Jeep parked in the rear of the residence [*Id*. 0:10–2:34]. On redirect examination, DUSM Dahl testified that he did not film the video of the residence, nor did he know when it was taken [Doc. 164 pp. 89–90].

Following the parties' arguments, the undersigned took the matter under advisement.

## II. FACTUAL FINDINGS

Around November 2023, TFO Chris Stewart, who works for the KCSO, requested the assistance of the Smoky Mountain Fugitive Task Force to arrest Mateo James. Defendant James had four outstanding arrest warrants from Knox County for probation violations involving distribution of marijuana and carrying a weapon and a warrant from Blount County for a probation violation involving assault. Additionally, Defendant James had a 2019 felony conviction for Schedule VI drugs. TFO Stewart, who is a member of the Fugitive Task Force, had been surveilling the area of Cecil Avenue, Cherry Street, and Magnolia Avenue for two weeks looking for Defendant James and had been "spot checking" a residence at 2825 Cecil Avenue. Beginning on November 12 or 13, TFO Stewart observed a black Jeep parked at the residence on multiple occasions and also observed Defendant James driving the black Jeep.

On the morning of November 15, 2023, TFO Stewart provided the Fugitive Task Force with information on Defendant James and his warrants and photographs of Defendant James. The

Fugitive Task Force members made plans to arrest Defendant James at the residence. Seven or eight members of the Fugitive Task Force ("the team") led by DUSM Greg Dahl conducted surveillance of the residence from both directions on Cecil Avenue. They observed the black Jeep parked at the residence and saw Defendant James come out of the residence and drive away in the black Jeep. A short time later, the black Jeep returned and parked behind the residence, and Defendant James entered the residence. The team proceeded quickly to the residence in two vehicles. One vehicle parked in the driveway of the residence and the other vehicle, which contained DUSM Dahl, parked in the neighboring driveway on the opposite side of the residence. Several officers exited the vehicles and ran to the back of the residence to create a perimeter to prevent escape from the rear of the residence. A column of officers with weapons drawn and with DUSM Dahl in the front carrying a ballistic shield advanced toward the front door of the residence.

When the officers drew even with the front door, DUSM Dahl could see Defendant James standing behind the glass storm door watching them and could smell the odor of marijuana coming from the residence. Several members of the team commented on the odor of marijuana. DUSM Dahl saw Defendant turn his head to look over his shoulder as if speaking to someone else in the residence. DUSM Dahl commanded Defendant James to show his hands, and Defendant complied holding up his empty hands. As DUSM Dahl and the other officers mounted the steps, Dahl commanded Defendant James to step out of the residence. Defendant stepped out onto the porch and the storm door swung shut behind him but did not latch. Two pit bull dogs just inside the door were barking and knocking against the door as they tried to get out. DUSM Dahl passed Defendant off to another officer in the column, who took Defendant down the steps where he was handcuffed and frisked. One of the team members asked Defendant James if anyone else was inside the residence, and Defendant said his cousin was inside.

As Defendant passed him at the top of the steps, DUSM stepped onto the porch and placed his foot and the shield against the door to hold it closed and to protect the team from any shots from inside. Through a clear portion of the shield and through the glass door, DUSM Dahl saw a handgun with an extended magazine lying on the seat of a chair two to three feet from where Defendant James had been standing at the door. He also saw the barrel of a rifle extending from a backpack beside the chair. DUSM Dahl kicked the door and yelled for anyone inside the house to come to the sound of his voice. When he received no response, DUSM radioed the officers at the back of the house and directed them to open a back door to allow the dogs to get out. After receiving confirmation from the officers in the back that the dogs were out, DUSM Dahl, still carrying the shield, and other officers swept the residence looking for other people. Locating no one else inside, the officers exited the residence and secured it.

KCSO Detective Matthew Johnson from the Narcotics Unit was called to the scene, and he also smelled a strong odor of marijuana coming from the residence. Detective Johnson advised Defendant James of the *Miranda* warnings and interviewed him. Defendant James told Detective Johnson that the residence was not his house but, instead, was his cousin Shawn Freeman's house. Defendant James said Freeman was at the house and must have fled into the woods when the police arrived. Defendant James said that he smoked marijuana with the residents and knew the residents had purchased guns for protection after the residence was broken into. Defendant James denied knowing how many or the types of firearms in the residence, nor did he know about other drugs in the residence. Defendant James admitted that he had a small bag of heroin, which the officers seized when they frisked him, and said he snorted the heroin to keep from feeling sick.

That afternoon, Detective Johnson applied for a search warrant for the residence. Knox County Criminal Court Judge Scott Green issued a search warrant for the residence at 2:01 p.m.

on November 15, 2023. Officers executed the search warrant at 2:21 p.m. that day and seized controlled substances including methamphetamine and marijuana, seven firearms and ammunition, $1,723, scales, and four cell phones.

## III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. It requires that law enforcement have probable cause and obtain a search warrant before searching a residence. *Collins v. Virginia*, 584 U.S. 586, 593 (2018) ("At the [Fourth] Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (citations omitted & modified)).

Defendants contend that law enforcement's warrantless entry into the residence and search of the residence pursuant to a search warrant both violate the Fourth Amendment [Doc. 31 p. 1; Doc. 32 p. 1]. Specifically, they argue that the officers lacked a reasonable belief that their safety was at issue to conduct a protective sweep of the residence [Doc. 31 p. 5; Doc. 32 pp. 3–5]. They also argue that the search warrant was not supported by probable cause because it is based upon illegally gained information, the supporting affidavit does not show a nexus between the residence and drug trafficking, and it contains material false statements intended to mislead the issuing judge [Doc. 31 pp. 5–7, 8–9; Doc. 32 pp. 4–6]. Defendants deny that the officers executed the search warrant in good faith [Doc. 164 pp. 95–96].

For the reasons set forth below, the undersigned finds that Defendant James lacks standing to challenge either search of the residence. But even considering the arguments of both Defendants, the officers reasonably conducted a protective sweep of the residence after observing firearms through the glass door and suspecting another person was present in the residence. The undersigned also finds Detective Johnson's affidavit provides probable cause for the search

warrant and includes a nexus to the residence. Further, Defendants have not demonstrated a reason to look beyond the four corners of the affidavit in a *Franks* hearing. Finally, the undersigned finds the officers searched the residence in good faith reliance on the search warrant.

**A. Standing**

A claimant alleging a Fourth Amendment violation must have a legitimate expectation of privacy in the place searched or the thing seized. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). "[S]tanding is 'an element' of a Fourth Amendment suppression claim[,]" and the person raising the Fourth Amendment challenge shoulders the "burden" of demonstrating his or her standing. *United States v. Russell*, 26 F.4th 371, 375 (6th Cir. 2022). The term "standing" has become "shorthand" for the requirement that a defendant must show that a search or seizure infringed upon his or her own rights. *Id*. at 374.

"To establish standing, 'the defendant must show (1) that he had a subjective expectation of privacy [in the location], and (2) that his expectation was objectively reasonable.'" *United States v. Carney*, Nos. 24-6051 & 25-5097, 2026 WL 813847, at *5 (6th Cir. Mar. 24, 2026) (quoting *United States v. Washington*, 573 F.3d 279, 282 (6th Cir. 2009)) (petition for cert. filed July 28, 2026). In assessing the reasonableness of a defendant's expectation of privacy, the Court examines

> the person's proprietary or possessory interest in the place to be searched or item to be seized[;] whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

*United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (quoting *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)).

"It is well-settled that a person has no reasonable expectation of privacy where he is neither a resident nor an overnight guest in a residence." *United States v. Plavcak*, 411 F.3d 655, 665 (6th Cir. 2005) (citation and footnote omitted). An overnight social guest, however, "has a reasonable expectation of privacy in the place where he sleeps at night." *United States v. Allen*, 720 F. App'x 254, 257 (6th Cir. 2018) (citing *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990)); *Washington*, 573 F.3d at 283 ("The Sixth Circuit has generously construed the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents." (citation omitted)). In contrast, an individual in another's residence for a short time to engage in drug trafficking has no legitimate expectation of privacy in the residence. *See Minnesota v. Carter*, 525 U.S. 83, 90–91 (1998) (explaining that "[p]roperty used for commercial purposes is treated differently for Fourth Amendment purposes from residential property").

An overnight guest has a legitimate expectation of privacy in the host's residence. *Carney*, 2026 WL 813847, at *5 (citing *United States v. Knowledge*, 418 F. App'x 405, 407 (6th Cir. 2011) (citation omitted)). "To otherwise have a reasonable expectation of privacy as a guest at another person's residence, a defendant must 'establish that he has a meaningful connection to the residence.'" *Id*. (quoting *United States v. Haynes*, 108 F. App'x 372, 374 (6th Cir. 2004) (citation omitted)). Evidence of such a connection includes that the defendant was staying at the residence recently, occasionally stayed overnight, kept personal items there, had a relationship with the residents, or could stay there even when other residents were gone. *Id*. (citing *United States v. Pollard*, 215 F.3d 643, 647–48 (6th Cir. 2000)).

At the hearing, Defendant James relied exclusively on Detective Johnson's affidavit to establish his standing to challenge the searches of the residence [Doc. 164 pp. 10–12].[5] The affidavit, however, fails to show Defendant James was a resident of 2825 Cecil Avenue or even an overnight guest. It states only that TFO Stewart observed the black Jeep that Defendant James has been seen driving parked at the residence on "multiple occasions" over a two-week period during which TFO Stewart conducted surveillance of the residence. The affidavit also states that on November 15, 2023, surveilling officers saw Defendant James arrive at the residence in the black Jeep, park, and go inside. Finally, the affidavit relates that officers interviewed Defendant James after his arrest outside the residence and that Defendant James said that "he is not the primary resident of the home" [Exh. 1 p. 4]. None of these assertions demonstrate that Defendant James was an overnight guest at the time of the protective sweep and execution of the search warrant. *See Carney*, 2026 WL 813847, at *6 (observing the homeowner's testimony that defendant slept at her residence occasionally did not establish a reasonable expectation of privacy at the time of the seizure). Moreover, the audio recording of Defendant James's interview shows that he denied that 2825 Cecil Avenue was his home, stated that it was his cousin Shawn Freeman's residence, and said he came over occasionally to play videogames with his cousin and partake of marijuana [Exh. 3].

---

[5] Defendant James also argues that he has standing to challenge his arrest and the search of his person [Doc. 164 p. 12]. The undersigned agrees. However, Defendant James does not challenge his arrest, nor the search of his person incident to his arrest, nor seek suppression of the small bag of heroin seized from his person incident to his arrest. Moreover, although the November 15, 2023 search warrant is for Defendant James and the residence, Defendant was already in custody when the search warrant was executed, and the Court has no information that his person was searched again pursuant to the search warrant. Accordingly, the undersigned focuses on Defendant James's standing to challenge the searches of the residence.

Defendant James points to Detective Johnson's conclusion that he thinks probable cause exists to believe that Defendant James currently resides at 2825 Cecil Avenue [Exh. 1 p. 7] as the officer's sworn statement that he lives at the residence [Doc. 164 p. 10]. The undersigned questions whether the affidavit lists sufficient information to substantiate this conclusion. In any event, the burden rests with Defendant James to show that he has a meaningful connection to the residence. The undersigned finds that the evidence presented at the evidentiary hearing, i.e., the audio recording of Defendant James's interview, contradicts any suggestion that he was an overnight guest at the time of the searches. Accordingly, the undersigned finds Defendant James lacks standing to challenge either search of the residence.

The affidavit does not mention Defendant Freeman, but Defendant Freeman introduced the audio recording of Defendant James's interview in which James says the residence is his cousin Shawn Freeman's house.[6] Additionally, unlike with Defendant James, the Government does not challenge Defendant Freeman's standing to contest the searches of the residence. At the suppression hearing, the undersigned asked AUSA Johnson whether the Government had any issues with Defendant Freeman's standing, and she responded that it did not [Doc. 164 p. 38]. If the government concedes a defendant has standing, it "waive[s] the argument." *Russell*, 26 F.4th at 375 (citation and footnote omitted). Here, Government expressly waived the issue of Defendant Freeman's standing at the suppression hearing, but even if it did not, the audio recording establishes Defendant Freeman's standing as a person with a proprietary or possessory interest in the residence.

---

6 In his motion, Defendant Freeman states that officers interviewed his grandfather, Kent Tharp, who told the officers that he (Defendant Freeman) rented and maintained the property [Doc. 31 p. 3 n. 1–2]. Defendant did not provide evidence or argument in support of this statement at the evidentiary hearing.



Case 3:24-cr-00087-KAC-DCP Document 189 Filed 08/14/26 Page 26 of 43
PageID #: 1279

In summary, the undersigned finds that Defendant James lacks standing to challenge the searches, but Defendant Freeman has standing to contest both searches.[7]

**B. Protective Sweep**

Defendants argue that the officers illegally entered the residence without a warrant after arresting Defendant James outside of the residence [Doc. 31 p. 5; Doc. 32 pp. 2–4]. They contend that once officers arrested Defendant James outside the residence, they should have left and that the arresting officers lacked reasonable articulable facts that another person in the residence presented a danger to them [Doc. 31 p. 5; Doc. 32 pp. 3–5; Doc. 164 pp. 5, 8, 14, 94–97].

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Protective sweeps are an exception to the warrant requirement of the Fourth Amendment. *United States. v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996).

"The Supreme Court has identified two types of warrantless protective sweeps of a residence that are constitutionally permissible immediately following an arrest." *United States v. Archibald*, 589 F.3d 289, 295 (6th Cir. 2009). In the first type, when an individual is arrested inside the dwelling, the officer may "'as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which

---

7 Because Defendants relied to some degree on each other's evidence presented at the November 21 evidentiary and suppression hearing, the undersigned will consider both Defendants' arguments on the challenges to the searches in analyzing the issues. Moreover, even assuming Defendant Freeman was an overnight guest at the residence and, thus, enjoyed an expectation of privacy there, his Fourth Amendment claims still fail as discussed below. *See United States v. Moody*, No. 25-1898, 2026 WL 1961915, *2 n. 1 (6th Cir. July 7, 2026) (observing that a defendant's reasonable expectation of privacy is one element of a Fourth Amendment claim and the court need not address standing before addressing other aspects of the merits of defendant's Fourth Amendment claims).

an attack could be immediately launched.'" *United States v. Westley*, No. 22-3356, 2023 WL 5377894, at *13 (6th Cir. Aug. 22, 2023) (quoting *Buie*, 494 U.S. at 334)). This type of protective sweep does not require any probable cause or reasonable suspicion. *Buie*, 494 U.S. at 334.

The second type of protective sweep permits an officer to search beyond immediately adjoining areas, provided that the officer can show that he or she "possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Id*. (citations omitted). Such a sweep is "not a full search of the premises[] but may extend only to a cursory inspection of those spaces where a person may be found." *Id*. at 335. Further, because it is not a full search, the sweep must "last[ ] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id*. at 335–36.

The Government argues that the second type of protective sweep is at issue here because Defendant James was arrested outside the residence and because the officers reasonably suspected another person was inside and had access to guns [Doc. 34 p. 5]. The undersigned agrees. Defendant James was arrested once he stepped outside the residence onto the porch. "A number of courts have categorized this very sort of doorstep, front porch, doorway, or threshold arrest as an outside—not inside—arrest under the *Buie* analysis and have thus required that the protective sweep be justified by an officer's reasonable belief in the presence of a dangerous third party." *Archibald*, 589 F.3d at 297 (citation modified) (analyzing protective sweep after officer "stepped into the threshold of the door to initiate the arrest by grabbing [the defendant, and] . . . then completed [the arrest] outside the residence where [the defendant] was handcuffed and patted down") (collecting cases).

Defendants argue that once Defendant James was arrested outside the residence, the officers had no reason to believe that anyone else was inside or that the individual posed a danger. DUSM Dahl, however, testified that the two guns he saw through the glass storm door[8] posed a danger to the officers because Defendant had just told another officer that another person was inside the residence [Doc. 164 p. 51]. DUSM Dahl said that after observing the firearms through the door and only a few feet from where Defendant James, a convicted felon, had been standing, he knew the officers would be there longer investigating a potential crime of Defendant James's possession of firearms [*Id*. at 51–52]. He stated that a "safety sweep" was necessary to make sure the person remaining in the house did not access the firearms [*Id*. at 52]. Added to these facts are DUSM Dahl's observation of Defendant turning his head and looking over his shoulder as if speaking to someone in the residence; the officers' knowledge that Defendant James, a convicted felon, had outstanding warrants for distributing dangerous drugs; and the officers' detection of the odor of marijuana coming from the residence. Accordingly, the undersigned finds that the officers had specific, articulable facts to support a reasonable belief that another person inside the residence posed a danger to the officers on the scene.

The undersigned finds the officers lawfully entered the residence and conducted a protective sweep. Defendants do not argue, nor does the evidence suggest, that the protective sweep was longer than necessary. Also, Defendant Freeman acknowledged that no evidence was

---

[8] At the evidentiary hearing, Defendants argued that DUSM Dahl could not have seen firearms through the storm door due to the reflection of the houses across the street on the glass door as is shown in the video recording [Doc. 164 pp. 7, 97; Exh. 10]. DUSM Dahl testified, however, that he placed the ballistic shield against the door, stood behind the shield, and viewed the room through the clear triangle in the shield [Doc. 164 p. 47]. Thus, DUSM Dahl and the shield would have prevented a reflection on the glass door. DUSM Dahl affirmatively testified that he saw the pistol on the chair and the rifle through the triangle on his shield [*Id*. at 47]. The undersigned credits that testimony.

seized during the protective sweep [Doc. 164 p. 9]. The protective sweep comports with the Fourth Amendment.[9]

### C. Probable Cause

Defendants argue that the affidavit does not provide probable cause to search the residence because (1) it is based on evidence illegally obtained during the protective sweep, and (2) it fails to show a nexus between the residence and drug trafficking [Doc. 31 pp. 3–5; Doc. 31 pp. 5–6].

To satisfy the requirements of the Fourth Amendment, a search warrant must be based on an affidavit containing "particularized facts" that demonstrate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983). "[P]robable cause is a flexible, common-sense standard," causing a person "of reasonable caution" to believe that the items are evidence of a crime. *Texas v. Brown*, 460 U.S. 730, 742 (1983) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). In other words, probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted). An issuing judge looks at the totality of the circumstances related in the affidavit to determine if probable cause exists to issue a search warrant. *Gates*, 462 U.S. at 238.

An issuing judge's determination that probable cause exists is entitled to "great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *Gates*, 462 U.S. at 236). This

---

[9] Having found the officers lawfully performed a protective sweep of the residence, the undersigned does not address the Government's alternative argument that the officers could lawfully enter the residence to secure it while obtaining a search warrant [*See* Doc. 34 pp. 5–6].

deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. *Id*. "The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. "[T]he duty of a reviewing court is simply to ensure that the [judge] had a substantial basis for concluding that probable cause existed." *Id*. at 238–39. In reviewing the sufficiency of probable cause for a search warrant, the Court considers only the information that was before the issuing judge—that is, the information contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010).

With these principles in mind, the undersigned turns to Defendants' arguments.

**1. Illegally Gained Evidence**

Defendant Freeman argues that when the information illegally gained during the protective sweep is removed from the affidavit, then the affidavit lacks probable cause [Doc. 31 pp. 4–5; Doc. 164 p. 5]. This argument fails on two fronts. First, as discussed above, the protective sweep did not violate the Fourth Amendment. Second, with the exception that no one else was inside the residence, no information gained during the protective sweep was included in the affidavit. DUSM Dahl observed the two firearms through the glass door after placing his shield against it to protect the officers arresting Defendant James from anyone shooting at them and from the dogs trying to get out through the front door. In other words, DUSM Dahl observed the guns from a lawful vantage point *before* entering the residence to conduct the sweep. DUSM Dahl and the other officers detected the odor of marijuana coming from the residence before they stepped onto the porch. The other firearms and controlled substances observed during the protective sweep are not included in the affidavit.

Detective Johnson's affidavit provides probable cause for the issuance of the search warrant.[10] While approaching the residence to arrest Defendant James on outstanding warrants, multiple officers smelled the "strong odor" of marijuana coming from within the residence [Exh. 1 pp. 3–4]. Defendant James, who had a prior felony drug conviction and warrants for violating probation by distributing marijuana and carrying weapons, was arrested at the residence and had one-half gram of heroin on his person at the time of his arrest [*Id*. at 3]. A surveilling officer saw Defendant James's black Jeep at the residence on multiple occasions in the two weeks preceding his arrest [*Id*.]. DUSM Dahl saw "a Glock handgun with an extended magazine and a backpack containing what he believed to be a rifle" through the glass front door while assisting with Defendant James's arrest [*Id*. at 4]. Based upon his training and experience, the affiant knows that drug dealers possess firearms to protect their contraband and proceeds "from robbers and thieves as drug dealers are often times the victims of robberies and 'rip offs' during a drug transaction" [*Id*. at 6 (¶ 16)]. After his arrest, Defendant James told officers that the residents of the house use marijuana, engaged in "illegal activities," keep marijuana in the residence, and "keep multiple firearms to protect themselves from home invasions" [*Id*. at 4]. This information provides a substantial basis for the issuing judge to find probable cause for a search warrant.

**2. Nexus**

Defendants assert that the affidavit fails to provide a nexus between the residence and drug trafficking [Doc. 31 pp. 6–7; Doc. 31 pp. 5–5]. They contend that no connection exists between Defendant James and the residence, particularly because he was arrested outside [Doc. 31 p. 6;

---

[10] Defendants' arguments regarding false statements in the affidavit are addressed below. Here, the undersigned evaluates whether the information within the four corners of the affidavit provides probable cause.

Doc. 164 pp. 5–6, 9].[11] Moreover, the fact that Defendant James was arrested outside the residence is insufficient by itself to provide a nexus [Doc. 31 p. 6; Doc. 164 p. 7]. Defendants argue that the affidavit is devoid of information that drug distribution was occurring at the residence [Doc. 164 pp. 14–15]. They contend that neither Defendant James's arrest, nor the remaining facts—that Defendant James was at the residence, that the odor of marijuana is in the front yard, that Defendant James had a small amount of heroin in his pocket, and that a gun was visible on a chair—are insufficient to show that evidence of or the proceeds from drug dealing are located in the residence [*Id*. at 15–17].

"To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). In other words, probable cause requires a "nexus between the place to be searched and the evidence sought." *Id*. (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)); *see also United States v. Sanders*, 106 F.4th 455, 465 (6th Cir.) (en banc) (holding a search warrant affidavit must contain a "probable cause nexus," which is information that the items to be seized are located on the property to be searched), *cert. denied*, 145 S. Ct. 603 (2024). "The connection between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (quoting *Carpenter*, 360 F.3d at 595). Assessing whether an affidavit establishes a nexus turns upon the facts of a particular case and requires examination of the totality of the circumstances.

[11] Defendants also assert that the affiant's conclusion that Defendant James resides at 2825 Cecil Avenue is not true and the affiant knew that at the time he submitted the affidavit [Doc. 31 p. 6; Doc. 32 pp. 5–6]. The undersigned addresses Defendants'' arguments about false statements in the affidavit in the *Franks* analysis below. Here, the undersigned examines Defendants' arguments that Defendant James's mere presence at the residence and arrest there is insufficient to provide a nexus.

*Id*. The Court must determine "whether the [issuing judge] had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Merriweather*, 728 F. App'x 498, 504 (6th Cir. 2018) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).

One method of establishing nexus is evidence showing that a "known drug dealer," i.e., a person "engaged in continual and ongoing operations typically involving large amounts of drugs," resides at the location to be searched. *Sanders*, 106 F.4th at 466 (citation omitted & modified). When these two factors are present, the judge may infer that evidence of drug trafficking will be found at the residence [*Id*.] Here, the information in the affidavit is thin on both prongs. The affidavit states that Defendant James has a prior felony conviction for "Schedule VI Drugs" and is arrested on "outstanding warrants for violation of probation for sale and delivery of marijuana and unlawful carry of weapon" [Exh. 1 p. 3]. This is information that Defendant James is involved in drug dealing, particularly of marijuana, but it does not speak to the frequency or extent of his drug trafficking. The affidavit also states that surveilling officers saw Defendant James's vehicle at the residence on multiple occasions in a two-week period, and James said he was "not the primary resident of the home" [*Id*. at 3–4]. The limited nature of this information causes Defendants to argue that no nexus exists because Defendant James is not sufficiently connected to the residence.

Here, however, the issuing judge need not infer that evidence of drug trafficking would be at the residence based upon Defendant James's status as a drug dealer who resides there, because the affidavit provides direct evidence of controlled substances on the premises. It states that multiple officers smelled the strong odor of marijuana coming from the residence [*Id*. at 3–4]. The affidavit also states that Defendant James agreed to answer questions about the residence, that he said illegal activities occur in the residence, and he said the residence contains marijuana and

multiple firearms [*Id*. at 4]. An officer's detection of the odor of marijuana coming from a residence provides a nexus that the residence contains illegal drugs. *United States v. Abernathy*, 843 F.3d 243, 251 (6th Cir. 2016); *see also United States v. Noble*, No. 24-5972, 2025 WL 1410331, *2 (6th Cir. May 15, 2025) (observing that it is well settled that the odor of marijuana as detected by a trained officer provides probable cause to search a vehicle or residence) (collecting cases); *United States v. Porter*, 774 F. App'x 978, 979 (6th Cir. 2019) (holding that the "distinctive fragrance of marijuana" detected by three officers coming from within the home "established at least a fair probability that the home contained evidence of a crime"). This evidence along with Defendant James's prior conviction and arrest warrants for marijuana distribution, the affiant's experience that drug dealers possess firearms to protect their contraband and proceeds, and the observation of a handgun with an extended magazine and a rifle in the front entry, provides a solid nexus between the residence and evidence of drug trafficking.

**D. *Franks* Hearing**

Defendants request a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge alleged false statements in Detective Johnson's affidavit [Doc. 31 pp. 6–7; Doc. 31 pp. 5–6; Doc. 164 pp. 5–6, 24–31, 33–34]. "In a *Franks* hearing, a court determines whether to suppress the fruits of an executed search warrant, where the warrant was the result of a false statement." *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). In the first instance, an affidavit supporting a search warrant is presumed to be valid. *United States v. Bowman*, No. 24-5835, 2025 WL 1721155, at *2 (6th Cir. June 20, 2025) (citing *Franks*, 438 U.S. at 171)). "A defendant challenging the validity of a search warrant's affidavit bears a heavy burden." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). To warrant a *Franks* hearing, a defendant "must make a 'substantial preliminary showing

that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'" *Crawford*, 943 F.3d at 309 (quoting *Franks*, 438 U.S. at 171). "The allegedly false statement,' moreover, must be 'necessary to the finding of probable cause." *Id*. (quoting *Franks*, 438 U.S. at 171). A defendant challenging the veracity of statements cannot rely on "conclusory" assertions but, instead, must identify "specific false statements" that are accompanied by an offer of proof. *Bowman*, 2025 WL 1721155, at *2 (quoting *Sanders*, 106 F.4th at 471 & *United States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014)).

A defendant seeking a *Franks* hearing must make a substantial showing that the affiant intentionally or recklessly included or omitted the statement from the affidavit. *Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019). A statement in the affidavit "is only considered to be issued with 'reckless disregard for the truth' if a defendant shows that the affiant subjectively 'entertained serious doubts as to the truth of his allegations.'" *Bateman*, 945 F.3d at 1008 (6th Cir. 2019) (citation modified) (quoting *United States v. Cican*, 63 F. App'x 832, 836 (6th Cir. 2003)). "Allegations of an officer's negligence or innocent mistake are insufficient." *Id*. (citation modified) (quoting *Franks*, 438 U.S. at 171).

The "well-settled framework for *Franks* hearings requires a defendant to 'point to specific false statements,'" in the affidavit that he claims are false or state the alleged omission. *United States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014) (citations modified & omitted). Here, Defendants raise four alleged false statements:

> (1) The affiant's conclusion that Defendant James "currently resides at 2825 Cecil Avenue, Knoxville, Tennessee [Doc. 164 pp. 25–26 ; Exh. 1 pp. 4, 7];
>
> (2) The statement that Defendant James told Detective Johnson that "he [(James)] is aware illegal activities occur inside the residence" [Doc. 164 pp. 24 – 25, 28, 33–34; Exh. 1 p. 4];

(3) The statements that DUSM Dahl saw Defendant James and two firearms through the glass front door of the residence [Doc. 164 pp. 26 – 28, 97; Exh. 1 p. 4]; and

(4) The statement that "over a period of two weeks, [TFO Stewart] conducted surveillance at 2825 Cecil Avenue, Knoxville, Tennessee" [Doc. 164 pp. 29–30].

The undersigned examines each of these statements and finds that Defendants fail to make the substantial preliminary showing required for a *Franks* hearing because they do not show that the statements are false or material to probable cause. Defendants also fail to show that the affiant included false statements with an intent to mislead the issuing judge.

At the end of the affidavit, Detective Johnson provides a series of conclusions, clearly labeled as such, and the first of these is that Defendant James "currently resides at 2825 Cecil Avenue, Knoxville, Tennessee" [Exh. 1 pp. 6–7]. Defendants argue that this statement is false because Defendant James told Detective Johnson that the residence is not his house and belongs to his cousin Shawn Freeman [Doc. 164 p. 8, 25]. They suggest that the affiant knew Defendant James's actual address because he included Defendant James's driver's license number in the affidavit [*Id*. at 14–15]. Defendants contend this statement is material to probable cause because without this statement, the affidavit lacks any nexus between the residence and evidence of drug trafficking [Id. at 26].

The undersigned finds Defendants fail to make the substantial preliminary showing with regard to the affiant's conclusion that Defendant James was currently living at the residence. First, as the Government points out [Doc. 34 p. 10], this is the affiant's conclusion from the information in the affidavit, and the issuing judge was free to make other conclusions from the information contained in the affidavit. Moreover, Defendants do not establish this conclusion is wrong. Although the audio recording of the interview shows that Defendant told Detective Johnson

multiple times that the residence was not his house and that he comes over occasionally to play video games with his cousins, Detective Johnson could have concluded that Defendant James was staying at the residence, rather than the address listed on his driver's license,[12] based upon the frequency of Defendant James's vehicle being parked there and Defendant James's knowledge of personal details about the residents such as they smoked marijuana, they stored marijuana in the residence, the residence was previously broken into while the residents were not there, and they possessed multiple firearms. More importantly, whether Defendant James lived at the residence is not necessary to probable cause or nexus as discussed above.

Second, the affidavit states that following his arrest and receipt of the *Miranda* warnings, Defendant James agreed to answer questions about the residence and stated "he is aware illegal activities occur inside the residence" [Exh. 1 p. 4]. Defendants argue this statement is false because the recording of the interview shows Defendant James actually said is that the officers were engaging in illegal activity "behind an arrest warrant" [Doc. 164 pp. 24–25]. The undersigned's review of the first seven minutes of the audio recording show that although Defendant James denied knowing what illegal activities are going on in the residence, he agrees that the residents smoke marijuana when he is around but does not know about other drugs [Exh. 3 4:53–5:03]. The undersigned finds the Defendants fail to show this is a false statement. Moreover, the undersigned finds it is not material to probable cause given the odor of marijuana coming from the residence and Defendant James's statements that the residents use marijuana and keep marijuana in the residence.

---

[12] The undersigned will assume for the sake of argument that the address on Defendant James's driver's license is not 2825 Cecil Avenue, although Defendants did not present the license or any information on Defendant James's address. In his motion, Defendant Freeman contends that a different address also appeared on an arrest warrant, which the officers were executing [Doc. 32 pp. 5–6]. Likewise, the arrest warrants were not presented at the hearing.



Case 3:24-cr-00087-KAC-DCP Document 189 Filed 08/14/26 Page 38 of 43
PageID #: 1291

Third, the affidavit states that DUSM Dahl said "he observed Mateo James through the glass front door of 2825 Cecil Avenue[,] and "Dahl also observed a Glock handgun with an extended magazine and a backpack containing what he believed to be a rifle" [Exh. 1 p. 4]. Defendants contend that it was impossible for DUSM Dahl to see Defendant James or the firearms through the glass door due to the reflection on the door as demonstrated by the video taken during the execution of the search warrant [Doc. 164 pp. 26 – 28, 97; Exh. 10]. Defendants fail to demonstrate the statements in the affidavit are false. DUSM Dahl testified that while he was in the yard looking up at the glass storm door to the residence, he saw Defendant James standing by the door watching the officers. DUSM Dahl also testified that he saw the two guns inside the residence while standing in front of the glass door with his shield pressed against the door and looking through a clear portion of the shield. Thus, DUSM Dahl observed Defendant James and the guns from a different vantage point than the individual taking the video during the execution of the search warrant. A court may credit a witness's testimony "so long as [it] is facially plausible, internally consistent, and uncontradicted by extrinsic evidence." *United States v. Bowman*, No. 1:21-cr-56, 2022 WL 1518251, at *7 (E.D. Tenn. Feb. 11, 2022) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)), *report & recommendation adopted by United States v. Fort*, 2022 WL 1117101 (E.D. Tenn. Apr. 14, 2022). The undersigned finds that DUSM Dahl's testimony about seeing Defendant James and the firearms through the glass storm door is not contradicted by the video and credits his testimony.

Finally, the affidavit states that TFO Stewart told Detective Pickett who related to the affiant that "over a period of two weeks, [TFO Stewart] conducted surveillance at 2925 Cecil Avenue, Knoxville, Tennessee and observed the same black Jeep at the house on multiple occasions, which is the same Jeep, [Defendant James] was observed driving" [Exh. 1 p. 3].

Defendants contend a letter from the Government in response to a request for surveillance logs shows that TFO Stewart did not spend two weeks surveilling the residence but, instead, surveilled a large area that included Cecil Avenue [Doc. 164 pp. 29–30; Exhs 2, 4]. The undersigned finds that to the extent that the language of the affidavit is perhaps misleading as to the amount of time spent focusing specifically on the residence, it is immaterial. The letter introduced by Defendant Freeman states that law enforcement conducted "spot-check[s]" of the residence to look for Defendant James and his vehicle [Exh. 2 p. 1]. The letter states "[d]uring the two-week period, officers first saw the Jeep referenced in the search warrant approximately two to three days prior to obtaining the search warrant. Between the time they first observed the Jeep and the time they obtained the search warrant, officers observed the Jeep at 2825 Cecil Avenue on multiple occasions and observed James driving the Jeep" [*Id.*]. Accordingly, the affidavit accurately states that officers observed Defendant James's Jeep at the residence on multiple occasions. It is this information, rather than the amount of time spent focused on the residence, that is relevant to probable cause. Moreover, the Defendants do not demonstrate that the affiant knew his phrasing of the surveillance was inaccurate and drafted the affidavit in this way to mislead the judge.

The undersigned finds Defendants fail to make a substantial showing that the affiant included false statements necessary to probable cause and with the intent to mislead the issuing judge. Accordingly, Defendants' request for a *Franks* hearing should be denied.

**E. Good Faith**

Defendant Freeman argues that the good faith exception cannot apply in this case because the affiant made false statements in the affidavit and then assisted with the execution of the search warrant [Doc. 164 pp. 95–96].

"[J]udicial suppression is inappropriate when an officer conducts a search in 'objectively reasonable reliance' on a warrant later deemed to be invalid." *United States v. Neal*, 106 F.4th 568, 572 (6th Cir. 2024) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)); *see also United States v. Herring*, 555 U.S. 135, 141–42 (2009) (rejecting automatic exclusion of evidence and, instead, asking whether exclusion will provide "appreciable deterrence"). This is because "[p]enalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *United States v. White*, 874 F.3d 490, 505–06 (6th Cir. 2017) (first alteration in original) (quoting *Leon*, 468 U.S. at 921); *see also Neal*, 106 F.4th at 572 (observing that when the affidavit lacks probable cause, "the authorizing judge—not the officer—is the blameworthy party"). "When the good-faith exception applies, courts will not suppress evidence of a search if 'officers act[ed] in objectively reasonable reliance on a search warrant that is subsequently invalidated.'" *United States v. Nobel*, No. 24-5972, 2025 WL 1410331, at *2 (6th Cir. May 15, 2025) (alteration in original) (quoting *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005)).

The good-faith exception is limited in scope and does not apply when the issuing judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923 (citing *Franks*, 438 U.S. at 156). Nor does it "apply when an officer executing a search warrant relies on a warrant affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Nobel*, 2025 WL 1410331, at *2 (quoting *Leon*, 468 U.S. at 923). In this regard, officers cannot in good faith rely on a "bare bones" affidavit. *Id*. (citing *White*, 874 F.3d at 496). "[B]are bones affidavits nakedly assume or vaguely conclude, without attempting to demonstrate why, probable cause has been satisfied." *Sanders*, 106 F.4th at 468 (citations omitted). Bare bones

affidavits contain no facts in support of probable cause and provide only the affiant's "mere guess" that contraband or evidence will be found in the location to be searched. *Nobel*, 2025 WL 1410331, at *2 (quoting *White*, 874 F.3d at 496). In contrast, "[s]ome modicum of evidence, however slight[,] between the criminal activity at issue and the place to be searched" will support an officer's good-faith belief in the existence of probable cause. *United States v. McCoy*, 905 F.3d 409, 416 (6th Cir. 2018) (quoting *White*, 874 F.3d at 496); *see also Sanders*, 106 F.4th at 469 (same).

Here, as discussed above, the undersigned finds Defendants have not shown the affidavit contains false statements necessary to probable cause. Additionally, the undersigned finds that Detective Johnson's affidavit provides sufficient probable cause to believe that evidence of drug trafficking would be found in the residence. Multiple officers smelled a strong odor of marijuana coming from the residence and Defendant James, who was arrested for a probation violation involving marijuana distribution, told the officers that the residents keep marijuana in the residence. This information provides at least a modicum of information showing that evidence of illegal activity would be found in the residence.

Accordingly, even if the affidavit lacked a nexus to the residence, the undersigned finds the evidence seized in the execution of the search warrant should not be suppressed because the officers acted in good faith reliance on the search warrant.

## III. CONCLUSION

For the reasons discussed herein, the undersigned respectfully **RECOMMENDS** that Defendants' Motion to Suppress [**Docs. 31 & 32**] be **DENIED**.[13]

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

[13] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).